**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PAUL FAZIO : |  |
| 19 Scott Street : | CIVIL ACTION |
| Plains, PA 18705 : |  |
| : | No.: _____ |
| Plaintiff, : |  |
| v. : |  |
| : |  |
| ABBOTT LABORATORIES : | **JURY TRIAL DEMANDED** |
| 100 Abbott Park Road : |  |
| Abbot Park, IL 60064 : |  |
| and : |  |
| ESCREEN, INC. : |  |
| 8140 Ward Parkway, Ste. 300 : |  |
| Kansas City, MO 64114 : |  |
| : |  |
| Defendants. : |  |

**CIVIL ACTION COMPLAINT**

Plaintiff, Paul Fazio, by and through his undersigned counsel, hereby avers as follows:

## I. INTRODUCTION

1. Plaintiff has initiated this action to redress violations by his *current* employers, Abbott Laboratories and (Abbott) eScreen, Inc. (collectively, "Defendants") of the Americans with Disabilities Act ("ADA" – 42 U.S.C. §§ 12101 *et. seq.*), the Family and Medical Leave Act ("FMLA" – 29 U.S.C. §§ 2601, *et. seq.*), and the Pennsylvania Human Relations Act ("PHRA"). In particular, Plaintiff alleges that he has been subjected to a hostile work environment and has suffered other adverse (and retaliatory) actions in violation of the aforesaid laws.

## II. JURISDICTION AND VENUE

2. This Court, in accordance with 28 U.S.C. § 1331, has jurisdiction over Plaintiff's claims because this civil action arises under laws of the United States. There lies supplemental

jurisdiction over Plaintiff's state-law claims as they arise out of the same common nucleus of operative fact(s) as Plaintiff's federal claims herein.

3. This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in <u>International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945) and its progeny.

4. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and in addition, Defendants are deemed to reside where they are subject to personal jurisdiction, rendering Defendants residents of the Middle District of Pennsylvania.

5. Plaintiff is proceeding herein under ADA and has properly exhausted his administrative remedies with respect to such claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety (90) days of receiving a notice of dismissal and/or right-to-sue letter from the EEOC. Plaintiff's EEOC filings were also dual-filed with the Pennsylvania Human Relations Commission ("PHRC").

### III.   PARTIES

6. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7. Plaintiff is an adult individual, with an address as set forth in the caption.

8. Abbott Laboratories ("Defendant Abbott" where referred to individually) is a legal entity headquartered in Chicago, IL engaging in the development, manufacture, and sales of

health care products worldwide. This entity generally operates in four (4) segments: Established pharmaceutical products, Diagnostic Products, Nutritional Products, and Medical Devices. This entity, through its various affiliated entities, operations, and enterprise has employed in excess of 100,000 employees.

9. eScreen, Inc. ("Defendant eScreen" where referred to individually) is an entity identified as registered in Kansas City, MO. This entity provides drug testing products primarily used for pre-employment drug testing. Defendant eScreen is just one of many names Defendant Abbott utilizes for an aspect, segment or part of its business operations.[1]

10. Plaintiff's employment documentation, policies, and other benefit related information identify Defendant Abbott <u>and</u> Defendant eScreen (collectively hereinafter, "Defendants") as his employers. These entities are part of the same operations, utilize the same resources, have overlapping management, and are properly considered single, joint and/or integrated employers of Plaintiff.

11. At all times relevant herein, Defendants acted by and through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

## IV.    FACTUAL BACKGROUND

12. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

13. Plaintiff was hired by Defendants in or about mid-September of 2009; and in total, Plaintiff has worked for Defendants for approximately 12 years. Plaintiff remains *currently* employed with Defendants.

---

[1] Plaintiff was an employee of Alere, Inc., which acquired eScreen Inc. in or about 2012. In or about early 2016, Defendant Abbott acquired Alere, Inc. and eScreen Inc. and has since been a direct employer of Plaintiff.

14. Plaintiff's role and duties have naturally changed over his long tenure depending upon business need, product lines, and other factors. However, at relevant times underlying this lawsuit, Plaintiff had been employed in the title of Regional Business Director (and late in his tenure adjusted to a Regional Business Manager).

15. Notwithstanding Plaintiff's job title (which by name only would imply more of a management role), Plaintiff has functionally worked for Defendants as a salesperson. Higher-level job titles are common in such industries for more outward clout in product sales. Plaintiff has been a member of Defendants' Clinical Solutions Sales Team.

16. Plaintiff is a home-based, remote (or telecommuting) employee of Defendants. Plaintiff resides in and has worked from Luzerne County, Pennsylvania (within the Middle District of Pennsylvania).

17. Plaintiff is a 49-year-old man who has unfortunately suffers from numerous health problems, which have been very significant in the last approximate 5 years. In particular, Plaintiff has suffered from Chron's Disease, intestinal and abdominal problems, and other related complications. Plaintiff's disabilities as aforementioned have been what any medical practitioner would describe as being on the severe end of the spectrum for such diagnoses, as he has required surgery, therapy, medication, continual evaluations, intermittent medical leave, and other forms of treatment.

18. As a result of Plaintiff's disabilities, Plaintiff requested and was approved for intermittent leave under the Family and Medical Leave Act ("FMLA"). Plaintiff has utilized such federally-protected intermittent leave on an ongoing basis for several years leading up to the present (<u>and he continues</u> to use such leave, as needed).

19. Despite being an enterprise (of numerous entities) providing healthcare products worldwide, Defendants exhibit nothing short of *intolerance* towards employee health problems, need for accommodations, and medical leave. Defendants also fail to investigate complaints of discrimination in any meaningful way.

20. Plaintiff is about to dedicate below a substantial portion of his lawsuit to outlining with clear examples a very hostile work environment wherein his work was constantly questioned, scrutinized, and he was subjected to ongoing embarrassment within Defendants' organization. However, **it is critical to understand** that Plaintiff was at all times: (a) a top salesman; (b) year-over-year head and shoulders above most if not all of his sales team in objective metrics and revenue generation; and (c) recognized as a top and exemplary salesperson within Defendants' organization. Thus, although Plaintiff outlines a litany of weekly abuse for years, **it was not** premised upon anything related to Plaintiff's *actual* work, abilities, skills, targets, or accomplishments. Such hostility towards Plaintiff has been solely on account of his health, medical leave, and accommodation needs (and due to his complaints of discrimination).

21. On or about January 19, 2018, Plaintiff initiated a written complaint against his then supervisor Tom Hespe ("Hespe").[2] In this written complaint, Plaintiff explained *inter alia*:

   a. He was the victim of "harassment and intimidation;"

   b. Such mistreatment was directly due to "FMLA leave" and disclosures of "severe Crohn's disease;"

   c. Plaintiff was denied "time off from work for invasive surgery and recovery" by Hespe who demanded Plaintiff "work with him" as to Defendants' business needs and scheduling;"

   d. Hespe would openly discuss Plaintiff's health, medical leave needs, and attempt to embarrass Plaintiff; and

---

[2] Plaintiff referenced in his complaint mistreatment by another (Taylor), information he elaborated on following his written complaint to Defendants.

5

   e. Hespe was causing a stress-related disability of Plaintiff to get much worse.

22. In addition to overall intolerance towards health or accommodation needs, Defendants have exhibited a practice of failing to engage in any meaningful investigation or remedy of employee concerns (such as those of Plaintiff). To date, no meaningful investigation or remedy was ever undertaken based upon Plaintiff's initial January 2018 complaint above (to numerous levels of corporate management).

23. As time progressed, Plaintiff came to be managed by Tamara Taylor ("Taylor"), a Senior Director of Sales for Defendants.[3] Taylor has supervised Plaintiff directly and primarily from 2018 through the present. Hespe had upon information and belief been separated from Defendant for gross misconduct, sexual harassment, and other alleged impropriety (despite Plaintiff's attempts to raise concerns that were not properly addressed).[4]

24. As will be again relayed in this lawsuit, Plaintiff seeks relief for a hostile work environment *he endured from 2018 through the present* (and ongoing). This comprises a period of approximately 4 years thus far.[5] Taylor was mentored by Hespe, started managing Plaintiff in or about January of 2018, and participated in in immediately singling Plaintiff out for discrimination and retaliation at that time.

25. Defendants' management hated that Plaintiff utilized intermittent FMLA leave, discussed accommodation needs, and raised concerns about mistreatment for not working with

---

[3] From 2020 through 2021, Taylor's supervisor has been Kathy Ross (a Vice President).

[4] It would come as no surprise to Plaintiff if Hespe's separation was characterized by a severance-related separation accompanied by non-disclosure obligations (or even potentially characterized as voluntary to avoid imminent termination).

[5] Plaintiff's mistreatment by Hespe as outlined above is for context only, informational purposes, and demonstrative of health-related intolerance in the workplace (part of a larger pattern at issue). However, Plaintiff's hostile work environment and other actions forming the basis of this lawsuit *relate to his last approximate 4 years of employment <u>under the supervision of Taylor</u>.*

him (or being flexible) as to his medical conditions. This animosity fueled a very hostile environment towards Plaintiff.

26. On or about April 7, 2020, Plaintiff made a "formal complaint" about mistreatment from Taylor in writing to corporate management. The primary gist of Plaintiff's complaint was *inter alia*:

a. He was being continually harassed, intimidated, and threatened by Taylor;

b. He was being targeted on team calls (and in other ways) for humiliation;

c. He was being used as examples for anything bad that could occur, placing him in a negative light amongst his colleagues;

d. He was the only person being so aggressively questioned (or interrogated) about performance, targets, issues, and other aspects of the job during team calls;

e. He was being unnecessarily and over scrutinized (contrary to other comparator colleagues);

f. Taylor would knowingly violate policies to favor other peers unlike Plaintiff in numerous ways, even letting Plaintiff's colleague travel despite a travel ban at the time on Plaintiff's team (helping others than Plaintiff maximize success or revenue targets);

g. Taylor participating in or causing inputting of inaccurate or exaggerated information within Defendants' system that was not truly reflective of Plaintiff's work, sales, or accomplishments; and

h. Plaintiff outlined that the hostile work environment has taken place since 2018.

27. Defendants engaged in no meaningful investigation or remedy to abate the ongoing hostile work environment Plaintiff was experiencing as outlined in his April 7, 2020 correspondence. The examples in Plaintiff's complaint (and other negative actions towards him) were occurring on a weekly basis (which were continual and pervasive).

28. After attempting to avail himself of internal remedies and trying to follow corporate complaint procedures, Plaintiff was required to escalate his concerns externally. On or about August 21, 2020, Plaintiff filed a Charge with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Relations Commission ("PHRC"). In the body of his filings, Plaintiff stated:

> During my last approximate 5 years, I have been subjected to an escalating and perpetual *hostile work* environment. I also have utilized FMLA over the years, which has caused substantial antagonism towards me. This work environment has included but not been limited to: (a) demeaning treatment; (b) discouraging me from using FMLA leave as needed; (c) forcing me to (over) disclose health problems to avoid discipline or termination; (d) non-consideration of and/or dissuading me from pursuing upward mobility or promotions; (e) giving me intentionally difficult, disparate and knowingly unattainable goals; (f) telling me I am being watched and information is being kept on me; (g) unfair admonishment, scrutiny, and observation; and (h) other negative treatment which has directly and indirectly caused me an economic loss and emotional distress.

*See* 8/21/20 EEOC Charge.

29. What Plaintiff identified in his agency filing along with his prior formal complaints was occurring on a consistent basis (sometimes daily, weekly and monthly), creating an unlawful hostile work environment (which was premised upon discrimination and retaliation against him). And Plaintiff's 8/21/21 agency filings *were simultaneously served* upon Defendants.

30. On or about September 16, 2020, Plaintiff participated in a Webex meeting (which is a virtual video conference). More than 50 invites to a wide range of peers and management were sent for the Webex meeting. There were many participants during this meeting.

8

31. Ostensibly and potentially believing she may have been muted to the Webex conference participants, Taylor engaged in a profanity-laced tirade about Plaintiff (to Stephanie Bailey, a Sales Operations Manager) making numerous derogatory comments about him, laughing at him, and making overall inappropriate statements (including suggesting she would get him). This publicly-humiliating commentary was heard by Plaintiff and others. It was to be blunt, atrocious. And in a normal corporate culture, it would have resulted in *immediate termination* of Taylor (but not within Defendant).

32. On September 16, 2020, Plaintiff escalated in writing a "formal complaint" . . . "of discrimination" to high-level management of Defendants, such as Susan Percy (Employee Relations Manager) and Stephanie McCallum (Ethics and Compliance Officer).

33. Because Defendants were unable to conceal, ignore or hide what Taylor had done to Plaintiff in an open forum in front of many attendees, Plaintiff came to learn that Taylor had a disciplinary notice placed in her personnel file for her treatment of Plaintiff. Such information was shared with Plaintiff by Percy over a month later in late October of 2020, who led Plaintiff to believe his work environment concerns would subside thereafter.

34. From October of 2020 through early 2021, Plaintiff experienced continued (unrelenting) antagonism from Taylor. <u>Instead</u> of her abusive behavior subsiding or being dissuaded due to discipline, she heightened her discriminatory and retaliatory behavior (literally turning up the volume). By way of examples:

    a. Taylor canceled Plaintiff's management calls which were supposed to be consistent or weekly while keeping those of Plaintiff's peers;

    b. Plaintiff had duties and responsibilities removed from his purview;

    c. Nearly every coaching session with Plaintiff was canceled from mid-September of 2020 through early 2021;

  d. Plaintiff had his FMLA leave canceled or rendered ineligible without notice through Defendants' third party in late 2020 or early 2021 wherein he had to go through numerous steps to get it reinstated;

  e. Plaintiff had key accounts he serviced removed and transferred to others;

  f. Plaintiff was excluded from participation in numerous important discussions and meetings with management and/or his team;

  g. Taylor was still using any opportunity possible to demean Plaintiff;

  h. Plaintiff was being given unfair and inaccurate performance evaluation commentary and scores;

  i. Taylor participating in or causing manipulation of Plaintiff's scores, revenue, and other performance data placing him in a negative light and negatively impacting his compensation for work performed; and

  j. Taylor would intentionally stonewall, ignore or not respond to Plaintiff interfering with his ability to adequately perform his job.

35. Plaintiff made a written complaint about (and in conjunction with) his 2020 performance evaluation including stating: "I believe aspects of this performance evaluation are premised on my prior EEOC concerns and are also retaliatory." This was among other concerns of Plaintiff upon which he elaborated. Like Plaintiff's prior complaints internally and externally, Plaintiff **was not**: (a) apprised of an investigation into his discrimination or retaliation complaints; and (b) nothing changed in his work circumstances or management dynamic.

36. In fact, from 2019 through 2020, Defendants failed to meet with Plaintiff about all of his concerns, complaints of discrimination or retaliation, to interview witnesses, and the institution itself failed to even feign an attempt to care or look into what Plaintiff was seeking redress for in his work situation (in any realistic or meaningful way).

37. By March of 2020, Taylor had engaged in **one of the most serious discriminatory and retaliatory acts Plaintiff had ever experienced, causing him**

10

**catastrophic career and financial harm**. Any objective review of her actions would quickly and transparently demonstrate the following:

a. On (Thursday) March 4, 2021 (at 7:30 PM), Taylor disseminated an e-mail to Plaintiff's sales team identifying a huge opportunity to them to sell and market BinaxNow (of course inclusive of Plaintiff).

b. The pandemic was exceedingly serious in this timeframe, and this was a breakthrough rapid test for COVID-19, which was in exceedingly high demand (and anyone selling or marketing the product was to make tremendous income in commissions as it proverbially *sold itself*).

c. Plaintiff's team per the March 4, 2021 e-mail was to undergo training on Saturday, March 6, 2021 (in the morning) so that they could "hit the ground running Monday morning selling this to clinics."

d. On (Friday) March 5, 2021, Plaintiff e-mailed Taylor identifying he had been using several days of FMLA leave (Thursday to Saturday) and would not be able to attend the Saturday morning training per continuing of his several-day FMLA usage. Plaintiff was having a severe flareup of his health problems.

e. After Plaintiff advised of using an FMLA day during the training session, he was removed from e-mail threads by Taylor wherein she only communicated with the rest of Plaintiff's team. Plaintiff had only missed a series of several days (not any significant period of time, and less than a week). This removal was outrageous.

f. Taylor was non-responsive to Plaintiff's attempts to follow up with her between March 4th – March 6th. So on (Sunday) March 6, 2021, Plaintiff emailed Taylor (after his team had gone through the Saturday morning training) and stated: "May I please request the slide deck so I may also be refreshed and reach out to my clinics tomorrow a.m." Plaintiff, a very experienced pharma salesperson could have easily reviewed the training materials and sold the product to his clientele.

g. Plaintiff was following up with Taylor between March 7th – March 9th of 2021 as well (due to more non-responsiveness). During such exchanges, Taylor:

  i. **Yelled at Plaintiff telling he uses too much FMLA, his FMLA usage affects his performance, and she scolded him for continually taking FMLA**; and

11

      ii. Told Plaintiff he was removed from the sales team he was on and no longer eligible to sell such COVID rapid tests unlike his other peers.

38. Plaintiff estimates in the last few years he has lost hundreds of thousands of dollars due to: (a) having key clients removed; (b) being excluded from sales; (c) being functionally demoted and having responsibilities changed; and (d) being denied the ability to sell various products, such as COVID Rapid Products. His compensation each year has deteriorated drastically due to Taylor's discrimination and retaliation.

39. Tammy admitted to removing Plaintiff from his own team and excluding him from a key (high-dollar and high commission generating) product **because of his FMLA usage**.

40. On March 15, 2021, Plaintiff filed a 2nd EEOC Charge (dual filed with the PHRC) stating *inter alia*:

> The type of problems I relayed in my first EEOC Charge have continued through today. My year-end 2020 performance review was unfair and retaliatory. I had been denied more favorable products to sell (causing loss of income) despite being a top sales performer, and I am in essence being forced to quit and/or constructively discharged at this point in time. Following my exercise of medical leave for several days during the first week of March 2021, I was: (a) removed from my team; (b) prohibited from selling COVID rapid tests (a major income-producing product of Respondents); and (c) told by my management I used too much medical leave as negatively impacting the perception of my performance. As of March 2021, I had been completely alienated, denied substantial income, and reduced to an unclear role.

*See* March 15, 2021 EEOC Charge.

39. Despite **years** of written *and* verbal complaints of discrimination and retaliation and irrefutable evidence of a hostile work environment, Plaintiff was **never** apprised of any internal or external investigation into the breadth of his concerns. This blatant disregard for Plaintiff's concerns warrants punitive damages against Defendants.

40. As result of Defendants' failures, inaction(s) and ignoring of Plaintiff's legal concerns, Plaintiff has continued to suffer a hostile work environment even through today (and ongoing). The same type(s) of mistreatment, falsities, pretextual admonishment, inappropriate health commentary to or about Plaintiff, demotion(s), account changes or preclusion, and inequities outlined in this lawsuit taking place for years through the spring of 2021 <u>have continued</u> through the present (without the need for further redundance).

41. The actions for which Plaintiff seeks relief in this lawsuit are: (1) a hostile work environment; (2) all actions and inactions outlined above in this lawsuit that were taken against him to dissuade him from further complaints (constituting unlawful retaliation); (3) all actions or inactions in this lawsuit which can be construed as "adverse actions" due to unlawful discrimination and retaliation; and (4) all actions or inactions taken against Plaintiff that materially impacted his terms and conditions of employment, including but not limited to preventing upward mobility and/or resulting in financial losses to him.

### First Cause of Action
### <u>Violations of the Americans with Disabilities Act, as amended ("ADA")</u>
### ([1] Discrimination & [2] Retaliation)

42. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

43. The actions taken against Plaintiff as outlined throughout this lawsuit were because:

    (1) of Plaintiff's actual or perceived health problems (discrimination);

    (2) of Plaintiff's record of impairment (discrimination);

    (3) of Plaintiff's requested accommodations (retaliation); and

    (4) of Plaintiffs complaints of mistreatment due to his health or medical needs (retaliation).

44. These actions as aforesaid constitute unlawful discrimination and retaliation in violation of the ADA. And as stated at the commencement of this lawsuit, Plaintiff has properly exhausted all administrative remedies to properly proceed herein under such claims.

### Second Cause of Action
### Violations of the Family and Medical Leave Act ("FMLA")
### ([1] Interference; and [2] Retaliation)

45. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

46. For each year during Plaintiff's last 5 years of employment, Plaintiff was an eligible employee for leave under the Family and Medical Leave Act ("FMLA"). Plaintiff utilized such leave on an intermittent basis and as needed, constituting protected federal leave.

47. Plaintiff was: (a) dissuaded from using FMLA leave; (b) punished or admonished for using FMLA leave; (c) subjected to numerous adverse actions due to use of FMLA leave; (d) at times prevented from utilizing FMLA leave or discouraged from same; and (e) all actions and inactions outlined in this lawsuit were taken against Plaintiff to prevent further use of FMLA leave, because he utilized such FMLA leave, and to retaliate against Plaintiff for usage of FMLA leave.

48. Defendants' actions as aforesaid constitute interference and retaliation violations of the FMLA.

### Third Cause of Action
### Violations of the Pennsylvania Human Relations Act ("PHRA")
### ([1] Discrimination & [2] Retaliation)

49. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

50. The actions taken against Plaintiff as outlined throughout this lawsuit were because:

(1) of Plaintiff's actual or perceived health problems (discrimination);

(2) of Plaintiff's record of impairment (discrimination);

(3) of Plaintiff's requested accommodations (retaliation); and

(4) of Plaintiffs complaints of mistreatment due to his health or medical needs (retaliation).

51. These actions as aforesaid constitute unlawful discrimination and retaliation in violation of the PHRA. And as stated at the commencement of this lawsuit, Plaintiff has properly exhausted all administrative remedies to properly proceed herein under such claims.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendants are to promulgate and adhere to a policy prohibiting discrimination / retaliation in the future against any employee(s);

B. Defendant are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, commission or account losses, salary, pay increases, bonuses, insurance, and benefits.

C. Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused by Defendant's actions;

D. Plaintiff is to be awarded liquidated and punitive damages as permitted by applicable laws herein;

E. Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate; and

F. Plaintiff is to be awarded the costs and expenses of this action and a reasonable attorney's fees as provided by applicable federal and state law.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: _____
Ari R. Karpf, Esq.
3331 Street Rd.
Bldg. 2, Ste. 128
Bensalem, PA 19020
(215) 639-0801

Date: October 13, 2021